James Earl RAY, Petitioner-Appellant,

v.

J. H. ROSE, Warden, Respondent-Appellee.

No. 73-1543.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 9, 1973.

Decided Jan. 29, 1974.

Bernard Fensterwald, Jr., Washington, D. C., for petitioner-appellant; James H. Lesar, Washington, D. C., Robert I. Livingston, Memphis, Tenn., on brief.

W. Henry Haile, Asst. Atty. Gen., Nashville, Tenn., on brief, for respondent-appellee; David M. Pack, Atty. Gen., of counsel.

Before PHILLIPS, Chief Judge, and CELEBREZZE and MILLER, Circuit Judges.

WILLIAM E. MILLER, Circuit Judge.

James Earl Ray plead guilty on March 10, 1969, in a Tennessee criminal court to the charge of first degree murder in the assassination of Dr. Martin Luther King, Jr. He was sentenced to prison for a term of 99 years. Subsequently, after state remedies were denied without an evidentiary hearing, he petitioned the court below for a writ of habeas corpus, alleging certain constitutional violations. This appeal is from the denial of the writ and the failure of the district court to hold an evidentiary hearing on Ray's claims of constitutional violations. For reasons which we explain below we hold that petitioner is entitled to an evidentiary hearing.

Petitioner was arrested in London in June of 1968. While awaiting extradition, he wrote attorney Arthur Hanes of Birmingham, Alabama, requesting that Hanes visit him and discuss the case. Hanes made plans to go to London but was apparently concerned about whether Ray would be able to pay his fee. Consequently, he was receptive to the suggestion of author William Bradford Huie that Hanes persuade Ray to give Huie exclusive rights to information about Ray and, presumably, the assassination. Huie would then write a book, and Hanes, Huie and Ray would share in the royalties. In London, Hanes met with Ray, agreed to represent him, but insisted that Ray enter into certain contractual agreements. Essentially these agreements provided as follows: (1) Hanes was given complete power of attorney for Ray; (2) Ray assigned to Hanes 40% of all monies that would be received as a result of a subsequent agreement between Hanes and Huie; (3) Hanes was to act as "exclusive agent and attorney" for Ray "in the handling of his affairs, contracts, negotiations, and sale of any and all rights to information or privacy which he may have in and to his life or particular events therein to persons, groups or corporations for the purpose of writing, publishing, filming or telecasting in any form whatever."

After returning to Birmingham, Hanes met with Huie. The two then executed a tripartite contract, Hanes acting for Ray, which purportedly obligated Hanes and Ray to supply Huie with information on "The assassination of Martin Luther King, Jr., the alleged participation of Ray therein, and the life and activities of Ray . . . ." Huie, in return, agreed to pay Hanes and Ray each 30% of the gross receipts from the sale of Huie's work in the form of "magazine, book, dramatic, motion picture, television and/or other adaptations of every kind."

On July 19, 1968, Ray was extradited to Memphis, Tennessee. Trial on the charge of murder was set for November 12, 1968. Only two days before the trial was to begin, Percy Foreman, a Houston attorney, responded to entreaties from Ray's brothers by visiting him in the Shelby County Jail. As a result of that meeting, Ray asked Foreman to represent him and dismissed Hanes. On the date originally scheduled for trial, Foreman appeared as Ray's counsel and was granted a continuance until March 3, 1969, so that he could properly prepare the case. However, the judge warned Ray that he had "been granted extraordinary relief at a great cost and this Court will certainly examine most critically any further attempts to change counsel."

During subsequent hearings, Foreman complained that because of the heavy burden of his other cases and also a re-

cent illness, he would be unable to be ready for trial on March 3. The judge stood firm but ordered the public defender, Hugh Stanton, to assist Foreman and to be ready, if necessary, to take over the defense. (Ray never approved of the appointment and refused to talk to Stanton). Foreman persisted, moving again for a continuance on February 14, 1969, primarily on the ground that the investigation had been slowed because of Hanes' refusal to cooperate. This motion was granted; trial was reset for April 7, 1969.

On January 29 and February 3, 1969, Ray, Huie, Hanes and Foreman executed new agreements assigning to Foreman the rights that Hanes had formerly enjoyed under the original contracts. This time, however, Foreman was to receive 60% of the income from Huie's works.

Ray never stood trial. On March 10, 1969, he plead guilty to a charge of first degree murder. Judge Battle then sentenced him to a term of 99 years in the Tennessee State Penitentiary. Almost immediately thereafter Ray wrote Judge Battle, asking for a trial and requesting appointment of counsel to assist him. Judge Battle died before acting on these requests. Subsequently the motions were denied by another judge.

Ray's petition for habeas corpus relief was filed in the court below on December 4, 1969. The court denied an evidentiary hearing and held that petitioner's plea of guilty was knowing and intelligent and thereby operated as a waiver of all non-jurisdictional, constitutional defects. Moreover, the factual allegations were found to be insufficient to justify a holding that petitioner's constitutional rights were violated. Petitioner appeals from that decision.

Ray alleges that a number of his constitutional rights were violated during the course of his incarceration and the proceedings which culminated in his plea of guilty. In holding that the petition stated sufficient facts to show, if established as true, that the guilty plea was not intelligently and voluntarily entered, we focus primarily upon those factual allegations concerning improper and ineffective representation by counsel.

Petitioner asserts that the financial interest of his attorneys in the royalties from Huie's works created a conflict of interest which encouraged the attorneys to compromise Ray's defense in order to aid the sale of the book and possible movie. Foreman is alleged to have threatened and coerced both Ray and his family into a guilty plea. The reason for the pressure, allegedly, is that the book rights would be of little value were Ray to have been tried and found innocent.[1] As a result, petitioner asserts that he was denied effective assistance of counsel and that the plea of guilty was neither voluntary nor intelligent. In support of his contentions, petitioner enumerates a long list of factual allegations. The following is a summarization of some of the most pertinent:

(1) Hanes had apparently authorized Huie to conduct the investigation of Ray's case. When Ray requested that a professional investigator be hired, Hanes refused.

(2) Ray felt that at trial it would be necessary for him to take the stand in his own defense so that he could explain his actions on the day of the murder. Hanes rejected the idea saying, "Why give testimony away when we can sell it?"[2]

(3) Ray urged Hanes to seek a continuance because of substantial, adverse pretrial publicity. Hanes refused because the contract with Huie provided that they must go to trial within a certain number of days.

---

[1]. The assassination of Dr. Martin Luther King, Jr., because of his preeminence as a civil rights leader, engendered worldwide notoriety and vast publicity. Ray's arrest in London and his subsequent indictment, as well as his plea of guilty, were also matters of intense public interest.

[2]. Petitioner contends that Huie offered to pay $12,000 either to him or his family if he would refuse to take the witness stand.

(4) When Foreman replaced Hanes as counsel, Ray asked him to hire a Tennessee lawyer to assist in the case. Foreman said that he would retain John J. Hooker, Sr., but he never did.

(5) Despite the urgings of Ray, Foreman refused to take any action to halt adverse, pretrial publicity.

(6) On February 13, 1969, Foreman brought a document to the jail which he urged Ray to sign. Included therein was an authorization for Foreman to negotiate a guilty plea and also a waiver of any claim against either Huie or *Look* magazine for damaging Ray's chances for a fair trial. Ray signed the document but gave Foreman a two-page letter listing reasons why he should not plead guilty. Foreman said that it would be in Ray's interest to plead guilty even if he had not committed the crime: First, Ray stood to benefit financially. Second, John J. Hooker [3] would be the next governor of Tennessee, and he would give Ray a pardon within two or three years. Third, the prosecution was prepared to bribe a key witness to testify against Ray. Fourth, Foreman indicated to Ray that if he refused to plead guilty, Foreman would exercise less than his best efforts at trial. Finally, he told Ray that he would not withdraw from the case and that Judge Battle would not allow Ray to change attorneys.

(7) Neither Foreman nor Hanes made any active investigation of the case against Ray.

(8) By letter of March 9, 1969, Foreman agreed to advance $500 to Ray's brother Jerry "contingent upon the plea of guilty and sentence going through on March 10, 1969, without any unseemly conduct on your part in court."

(9) By a different letter of March 9, 1969, Foreman agreed to assign to Ray all income in excess of $165,000 which Foreman would receive from Huie's work. The assignment would take place when "the plea is entered and the sentence accepted and no embarrassing circumstances take place in the court room . . . ."

In deciding whether petitioner's claims of constitutional violations warrant an evidentiary hearing, we are guided by the standards laid down by the Supreme Court in Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). The Court there held that a district court *must* grant a hearing to an applicant for habeas corpus whenever "the merits of the factual dispute were not resolved in the state hearing . . . ." 372 U.S. at 313, 83 S.Ct. at 757. Elaborating on that directive, the Court said:

We hold that a federal court must grant an evidentiary hearing to a habeas applicant under the following circumstances: If (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

There cannot even be the semblance of a full and fair hearing unless the state court actually reached and decided the issues of fact tendered by the defendant. Thus, if no express findings of fact have been made by the state court, the District Court must initially determine whether the state

---

3. Presumably, Ray meant John J. Hooker, Jr. who was a candidate for governor in 1970.

court has impliedly found material facts. No relevant findings have been made unless the state court decided the constitutional claim tendered by the defendant on the merits. 372 U.S. at 313–314, 83 S.Ct. at 757.

Applying these guidelines it is clear that the allegations which are the subject of Ray's petition have never been tried upon their merits or resolved by any court—allegations which, if true, plainly negative any notion or idea that his guilty plea and his answers to Judge Battle were made voluntarily and intelligently. When petitioner entered his plea of guilty, Judge Battle, the Tennessee trial judge, instructed him as to his constitutional rights, as required, *see* Boykin v. Alabama, 395 U.S. 238, 89 S. Ct. 1709, 23 L.Ed.2d 274 (1969), but no inquiry was made into the specific contentions that are now before this Court. The questions asked by Judge Battle although very thorough, were directed to the voluntariness of Ray's guilty plea. Although these questions may have touched *inferentially* on the allegations in Ray's petition, we believe that the Court in Townsend v. Sain, *supra*, contemplated more than inferential treatment when it spoke of a "full and fair" hearing on the merits. Only by such a hearing may it be determined whether the plea was intelligent or voluntary or entered as the result of coercion, threats and promises.

The district court held that no hearing was required because the allegations, even if true, would not warrant issuance of the writ. Specifically, the court found that "the advice given to petitioner by his privately retained counsel 'was within the range of competence demanded of attorneys in criminal cases' ". We do not agree. The allegations which we have recited above, if true, would support a finding that Ray's attorneys deliberately compromised their client's interests in order to further the financial success of Huie's works in which they themselves had a substantial interest. Such conduct would constitute an outrageous abrogation of the standards which the legal profession sets for itself and upon which its clients have a right to rely. Clearly, these examples of misrepresentation, coercion and refusal to prepare for trial or protect the petitioner cannot be said to be within the acceptable range of competence of an attorney. Instead, if petitioner's assertions are correct, the actions of his attorneys made his defense "a farce and mockery of justice that would be shocking to the conscience of the court." Matthews v. Wingo, 474 F.2d 1266 at 1268 (6th Cir., 1973). If the allegations of the petitioner are correct, the trier of the facts might easily infer that Ray in entering his plea of guilty before Judge Battle and in acknowledging his guilt and the voluntariness of his plea, was acting because of the wrongful conduct and pressure of his attorneys—amounting to intimidation and coercion on their part. It would be difficult to conjure up a more flagrant violation of an attorney's duty to his client or one more likely to prejudice him in the defense of his case. While a lawyer in some circumstances may appropriately advise his client to plead guilty if he has knowledge of the pertinent facts and his advice is honestly and conscientiously given, the opposite is true where the attorney induces a plea of guilty solely for his own gain and without performing the minimum service of investigating the true facts of the case. The latter is true in the present case if we accept, as we must, the allegations of the petitioner. If an attorney's duty is faithfully to protect and represent his client's interests, uninfluenced and unaffected by conflicting considerations, as the courts have held, (leaving aside for the moment the "farce and mockery of justice" test), the necessity for an evidentiary hearing in the present case would appear to be inevitable. West v. Louisiana, 478 F.2d 1026 (5th Cir. 1973). We are not willing to sanction a rule that would permit an attorney to subordinate the rights of his client to receive fair and honest legal advice and related services to his own selfish interests.

Since petitioner plead guilty, he has waived his right to raise these possible constitutional violations unless it is shown that the waiver was made either involuntarily or unintelligently. United States v. Cox, 464 F.2d 937 (6th Cir. 1972). Waivers of constitutional rights are not lightly to be found. All of the surrounding circumstances should be examined to determine whether the waiver was in fact the product of improper coercion or inducement. *Cf.* Haynes v. Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963); Boykin v. Alabama, *supra*. Moreover, the role of competent counsel is crucial in advising the defendant of the nature of the charges and the defenses available to him—so much so in fact that pleas entered without the assistance of counsel are subject to special scrutiny. Brady v. United States, 397 U.S. 742, 748, n. 6, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970). In recent cases in which the Supreme Court has found guilty pleas to be voluntary, it has assiduously pointed to the presence of competent counsel. *See* Brady v. United States, *supra* at 756, 90 S.Ct. 1463; McMann v. Richardson, 397 U.S. 759, 767, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970); *see also* Colson v. Smith, 438 F.2d 1075 (5th Cir. 1971). If pleas entered in the absence of counsel are subject to special scrutiny, it follows, a fortiori, that allegations that counsel having a direct conflict of interest have so abused their position of trust as to induce a plea of guilty, should at least be examined to determine their accuracy.

If the allegations are correct, petitioner's counsel not only did not properly advise him but deliberately misled and coerced him. It is inconceivable to us how a plea entered under these circumstances could be either intelligent or voluntary. We are mindful that at the time of sentencing Judge Battle asked Ray whether his plea was the result of pressure, threats or promises. He was also asked if he fully understood that a plea bargain had been reached whereby he would receive a 99-year sentence, thus avoiding a sentence of death. Petitioner answered in the negative as to threats, promises or coercion, and assured the court that he was aware of the plea bargain and that his plea was made voluntarily and intelligently. Yet in light of the total circumstances preceding his sentencing, *see* Haynes v. Washington, *supra*, Ray could easily have believed that he had no other choice. He could follow the scenario prescribed by Foreman in his letter of March 9, 1969—enter the plea and accept sentence without creating any "embarrassing circumstances . . . in the court room"—or he could have gone to trial with the reasonable belief, if the contentions are accurate, that a fair hearing would be impossible.

In Dukes v. Warden, 406 U.S. 250, 92 S.Ct. 1551, 32 L.Ed.2d 45 (1972), the Supreme Court of Connecticut had reviewed the case of a petitioner who alleged that his plea of guilty was involuntary because his attorney had a conflict of interest. It held that on the specific facts presented the plea could not be said to be involuntary. The Supreme Court of the United States in affirming the Connecticut court quoted with approval the following from its opinion:

There is nothing in the record before us which would indicate that the alleged conflict resulted in ineffective assistance of counsel and did in fact render the plea in question involuntary and unintelligent. [Petitioner] does not claim, and it is nowhere indicated in the finding, nor could it be inferred from the finding, that either Attorney Zaccagnino or Attorney Delaney induced [petitioner] to plead guilty in furtherance of a plan to obtain more favorable consideration from the court for other clients. . . . Neither does the finding in any way disclose, nor is it claimed, that [petitioner] received misleading advice from Attorney Zaccagnino or Attorney Delaney which led him to plead guilty. . . . 406 U.S. at 256, 92 S.Ct. at 1554.

This is a far cry from the facts alleged in the present case where the most

egregious kind of conflict of interest is not only alleged but is directly stated to have caused and actually induced the plea of guilty.

Reversed and remanded.[4]

## APPENDIX

LAW OFFICES OF
PERCY FOREMAN

804 South Coast Building
Houston, Texas 77002

CA 4–9321

March 9th, '69

Mr. James Earl Ray,
Shelby County Jail,
Memphis, Tennessee.

Dear James Earl:

You have heretofore assigned to me all of your royalties from magazine articles, book, motion picture or other revenue to be derived from the writings of Wm. Bradford Huie. These are my own property unconditionally.

However, you have heretofore authorized and requested me to negotiate a plea of guilty if the State of Tennessee through its District Attorney General and with the approval of the trial judge would waive the death penalty. You agreed to accept a sentence of 99 years.

It is contemplated that your case will be disposed of tomorrow, March 10, by the above plea and sentence. This will shorten the trial considerably. In consideration of the time it will save me, I am willing to make the following adjustment of my fee arrangement with you:

4. Foreman's two letters of March 9, 1969 are included in the appendix to this opinion. Although Ray dismissed Hanes as his attorney, the record indicates that Hanes had received a substantial sum of money prior to the dismissal. Before Ray was sentenced on his plea of guilty two articles, written by Huie pertaining to the case, had been published by Look magazine. Also, after the sentence was imposed a book, authored by Huie, concerning the same subject was pub-

If the plea is entered and the sentence accepted and no embarrasing circumstances take place in the court room, I am willing to assign to any bank, trust company or individual selected by you all my receipts under the above assignment in excess of $165,000.00. These funds over and above the first $165,-000.00 will be held by such bank, trust company or individual subject to your order.

I have either spent or obligated myself to spend in excess of $14,000.00, and I think these expenses should be paid in addition to a $150,000.00 fee. I am sure the expenses will exceed $15,000.00 but I am willing to rest on that figure.

Yours truly,
/s/ PERCY FOREMAN

LAW OFFICES OF
PERCY FOREMAN

804 South Coast Building
Houston, Texas 77002

CA 4–9321

March 9, 1969

Mr. James Earl Ray,
Shelby County Jail,
Memphis, Texas. (sic)

Dear James Earl:

You have asked that I advance to Jerry Ray five ($500.00) of the "$5,000.-00", referring to the first five thousand dollars paid by Wm. Bradford Huie. On January 29th, Mr. Huie advanced an additional $5,000.00. At that time I had spent in excess of $9,500.00 on your case. Since then, I have spent in excess of $4,000.00 additional.

lished. It is to be inferred that these various publications produced a substantial sum of money, the exact distribution of which is not shown. The entire record reeks with ethical, moral and professional irregularities, demanding a full scale judicial inquiry. Without such a hearing, the record leaves no alternative to the conclusion that Ray's attorneys were more interested in capitalizing on a notorious case than in representing the best interests of their client.

But I am willing to advance Jerry $500.00 and add it to the $165,000.00 mentioned in my other letter to you today. In other words, I would receive the first $165,500.00. But I would not make any other advances—just this one $500.00.

And this advance, also, is contingent upon the plea of guilty and sentence going through on March 10, 1969, without any unseemly conduct on your part in court.

Yours truly,

/s/ PERCY FOREMAN

PF–4

P.S. The rifle and the white mustang are tied up in the suit filed by Renfro Hays. Court costs and attorneys fees will be necessary, perhaps, to get them released. I will credit the $165,500.00 with whatever they bring over the cost of obtaining them, if any.

/s/ PERCY FOREMAN

/s/ JAMES EARL RAY

CELEBREZZE, Circuit Judge (dissenting).

I must respectfully dissent from the majority.

If there existed undue pressure by counsel on Defendant to enter a guilty plea, the Defendant owed a duty to the Court to answer honestly the question put to him by the Court at the time of the entry of the plea.

The record discloses that the trial judge, in questioning Ray, very thoroughly inquired into the voluntariness of Ray's guilty plea and the consequences which would result therefrom. In no uncertain terms, Ray stated that his plea was being entered voluntarily and without pressure of any kind.[1] The record thus discloses that Ray "voluntarily and understandingly" entered his plea of guilty. Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969).

We are now asked to vacate the plea because it is alleged that it was in fact the result of coercion. Thus, we are asked to ignore the record in this case. In so doing, the Court leaves open for attack convictions which have been obtained in a manner specifically designed for the protection of the defendant. Indeed, the very reasons for conducting a thorough on the record examination of the defendant are to guard against the entering of a guilty plea which is not an intelligent and knowledgeable plea and to insulate the conviction from attack on the basis that it did not comport with due process. Boykin v. Alabama, *supra*, 395 U.S. at 244 n. 7, 89 S.Ct. 1709.

Although we expressly reserved judgment on the issue presently before us, we previously determined that allegations involving the same conduct of Ray's attorneys as is involved here, did not support a finding that Ray was not properly defended. Ray v. Foreman, 441 F.2d 1266 (6th Cir. 1971).

I would affirm the District Court's denial of the writ.

APPENDIX TO DISSENTING<br>OPINION

THE COURT: This is a compromise and settlement on a plea of guilty to murder in the first degree and an agreed settlement of 99 years in the Penitentiary, is that true?

MR. FOREMAN: That's the agreement, your Honor.

THE COURT: Is that the agreement? Alright, I'll have to voir dire Mr. Ray, James Earl Ray, stand. Have you a lawyer to explain all your rights to you and do you understand them?

A Yes, Sir.

THE COURT: Do you know that you have a right to a trial by jury on a charge of Murder in the First Degree

---

1. The examination of Ray by the District Court is included in the appendix to dissenting opinion.

against you, the punishment for Murder in the First Degree ranging from death by electrocution to any time over 20 years. The burden of proof is on the State of Tennessee to prove you guilty beyond a reasonable doubt and to a moral certainty and the decision of the jury must be unanimous, both as to guilt and punishment. In the event of a jury verdict against you, you would have the right to file a Motion for a New Trial addressed to the Trial Judge. In the event of an adverse ruling against you on your Motion for a New Trial, you would have the right to successive appeals to the Tennessee Court of Criminal Appeals and the Supreme Court of Tennessee and to file a Petition for Review by the Supreme Court of the United States. Do you understand that you have all of these rights?

A  Yes, Sir.

THE COURT: You are entering a plea of guilty to Murder in the First Degree as charged in the indictment and are compromising and settling your case on an agreed punishment of 99 years in the State Penitentiary. Is this what you want to do?

A  Yes, I do.

THE COURT: Is this what you want to do?

A  Yes, Sir.

THE COURT: Do you understand that you are waiving, which means giving up a formal trial by your plea of guilty although the laws of this State require the prosecution to present certain evidence to a jury in all cases on pleas of guilty to Murder in the First Degree? By your plea of guilty, you are also waiving your right to one, your Motion for a New Trial; two, successive appeals to the Supreme Court, to the Tennessee Court of Criminal Appeals and the Supreme Court of Tennessee and three, Petition to Review by the Supreme Court of the United States. By your plea of guilty, you are also abandoning and waiving your objections and exceptions to all the motions and petitions in which the Court has heretofore

ruled against you in whole or in part among them being one, Motion to Withdraw Plea and Quash Indictment; two, Motion to Inspect the Evidence; three, Motion to Remove Lights and Cameras from the Jail; four, Motion for Private Consultation with Attorney; five, Petition to Authorize Defendant to Take Depositions; six, Motion to Permit Conference with Huie; seven, Motion to Permit Photographs; eight, Motion to Designate Court Reporters; nine, Motion to Stipulate Testimony, ten, Suggestion of Proper Name. You are waiving or giving up all these rights. Has anything besides this sentence of 99 years in the Penitentiary been promised to you to get you to plead guilty? Has anything else been promised to you by anyone?

A  No, it has not.

THE COURT: Has any pressure of any kind by anyone in any way been used on you to get you to plead guilty?

A  No, No one, in any way.

THE COURT: Are you pleading guilty to Murder in the First Degree in this case because you killed Dr. Martin Luther King under such circumstances that it would make you legally guilty of Murder in the First Degree under the law as explained to you by your lawyers?

A  Yes, legally, yes.

THE COURT: Is this plea of guilty to Murder in the First Degree with an agreed punishment of 99 years in the State Penitentiary freely, voluntarily and understandingly made and entered by you?

A  Yes, Sir.

THE COURT: Is this plea of guilty on your part the free act of your free will made with your full knowledge and understanding of its meaning and consequences?

A  Yes, Sir.

THE COURT: You may be seated. Alright, are you ready for a jury?

MR. FOREMAN: Yes, your Honor.